# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 02 C 50254 | **DATE** | 6/19/2003 |
| **CASE TITLE** | | Hedberg vs. Barnhart | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached Report and Recommendation, it is the Report and Recommendation of the Magistrate Judge that Plaintiff's Motion for Summary Judgment be granted on the case remanded. On remand, the ALJ should establish a RFC limitation for Plaintiff that coincides with the vocational expert's testimony. These findings could be incorporated into a new RFC for Plaintiff. It is also the Recommendation of the Magistrate Judge that Defendant's Motion for Summary Judgment be denied. The parties are given ten day from service of this Order, as calculated under Rule 6, to appeal to Judge Philip G. Reinhard, pursuant to Rule 72 of the Federal Rules of Civil Procedure.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | Document Number |
| ✓ | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | JUN 19 2003 | | |
| | Docketing to mail notices. | | date docketed | | |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | 6/19/2003 | | |
| | | | date mailed notice | | |
| sp | courtroom deputy's initials | FILED-WD 03 JUN 19 AM 10:22 U.S. DISTRICT COURT CLERK | Date/time received in central Clerk's Office | sp mailing deputy initials | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

NANCY L. HEDBERG,            )

        Plaintiff,          )

           v.             )

JO ANNE B. BARNHART,       )
COMMISSIONER OF SOCIAL    )
SECURITY,             )

        Defendant.       )

Case No. 02 C 50254

Magistrate Judge
P. Michael Mahoney

U.S. DISTRICT COURT
FILED-DWD
03 JUN 19 AM 10:22

## REPORT AND RECOMMENDATION

Nancy Hedberg, ("Plaintiff"), seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits ("DIB") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. §1381(a). This matter is before the Magistrate Judge for Report and Recommendation pursuant to Rule 72(b) and 28 U.S.C. 636(b)(1)(B).

## I.    BACKGROUND

Plaintiff originally filed for DIB on May 13, 1994 alleging disability on May 4, 1994. (Tr. 58). Plaintiff's original application for benefits was denied on July 27, 1994. (Tr. 62). On September 28, 1994, Plaintiff filed a request for reconsideration. (Tr. 67). Plaintiff's request for reconsideration was denied on January 6, 1995. (Tr. 71). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on January 23, 1995. (Tr. 74). In a decision dated November 4, 1995, the ALJ found Plaintiff was not entitled to DIB. (Tr. 28). On December 22, 1995, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 204-207). On

February 20, 1997, the Appeals Council denied Plaintiff's request for review. (Tr. 211-212).

Plaintiff filed a second application for DIB on October 10, 1997,[1] again alleging disability on May 4, 1994. (Tr. 240). Plaintiff's second application for benefits was denied on April 2, 1998. (Tr. 213). On May 27, 1998, Plaintiff filed a request for reconsideration. (Tr. 217). Plaintiff's request for reconsideration was denied on October 23, 1998. (Tr. 218). Plaintiff then filed a request for a hearing before an ALJ on September 25, 1998. (Tr.220). Plaintiff appeared, with counsel, before an ALJ on July 7, 1999. (Tr. 27). In a decision dated January 24, 2000, the ALJ found that Plaintiff was again not entitled to DIB. (Tr.24). On March 22, 2000, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr.12). On April 26, 2002, the Appeals Council denied Plaintiff's request for review. (Tr. 11).

## II.  **FACTS**

Plaintiff was born on December 22, 1947 and was fifty-one at the time of her July 1999 hearing. (Tr. 31). According to her own testimony, Plaintiff graduated from high school and completed one year of nursing school at Glenwoods Hills Hospital in Minneapolis, Minnesota. (Tr. 31-32). After her one year of nursing school, Plaintiff testified that she received her Licensed Practical Nurse license. (Tr. 32). At the time of the hearing, Plaintiff, married with two children, was living with her husband. (Tr. 31). Plaintiff suffers from lipodystrophy, diabetes, and heart trouble. Plaintiff alleges that it is these three aliments that have prevented her from working since May 1994.

---

[1] Plaintiff's first application for DIB was denied by Judge Stillerman on November 4, 1995. The ALJ in this case set the onset date of alleged disability as November 5, 1995. In so doing, the ALJ eliminated any collateral estoppel issues that may have arisen had the ALJ placed the onset date prior to Judge Stillerman's November 4, 1995 decision.

According to Plaintiff's testimony, Plaintiff's most recent job ended in May 1994. (Tr. 32). From December 1993 to May 1994, Plaintiff was a part-time night charge nurse at the Park Ridge Terrace Nursing Home in Rockford, Illinois. (*Id.*). As a part-time night charge nurse, Plaintiff worked two days a week for eight hour shifts each day. (Tr. 34). Plaintiff stated that the reason she was only able to work part-time was because her "leg swelled so bad that, after two days in a row, [Plaintiff] couldn't bend anymore." (Tr. 35). At Park Ridge Terrace, Plaintiff's duties included passing medication, supervising aides, and helping with whatever was needed by either the staff or the patients. (Tr. 32). Physically, Plaintiff's job at Park Ridge Terrace required her to occasionally lift objects, including patients who fell (although Plaintiff later testified that she never actually "lifted" a patient but rather she would help "to turn and lift"), and handling shots, catheters, and other medical objects. (Tr. 33).

Prior to working at Park Ridge Terrace, Plaintiff worked at Fairview Plaza, from 1990 until December 1993. (Tr. 35). Plaintiff worked part-time at Fairview Plaza and was the night charge nurse. (*Id.*). For the most part, Plaintiff's duties at Fairview Plaza and Park Ridge Terrace were the same in that they both required assisting with patients and staff. (*Id.*). However, Plaintiff testified that the only substantial difference between the two was that Fairview Plaza had "a lot of psych patients ... ." (*Id.*). Plaintiff testified that, as with Park Ridge Terrace, she only worked two days a week for eight hour shifts because she was unable to work any longer due to her pain. (Tr. 36).

Before working at Fairview Plaza, Plaintiff worked on the line at Chrysler from 1988 to 1990. (*Id.*). Unlike the two above mentioned jobs, Plaintiff's job at Chrysler did not entail any nursing responsibilities. Rather, Plaintiff testified that her Chrysler job was a part-time summer job in which she worked maintenance and did cleaning. (*Id.*). Like her later jobs, Plaintiff's assembly

job required her to be on her feet most of the day, which Plaintiff testified caused her pain and swelling in her legs. (Tr. 37).

From 1986 to 1988 Plaintiff worked at Roosevelt Square Nursing Home. (*Id.*). Unlike her later nursing jobs, Plaintiff's nursing job at Roosevelt Square was full-time and required her to do some "charge nurse" duties as well as medical records duties. (*Id.*). Prior to Roosevelt Square, from 1982 to 1987, Plaintiff was a charge nurse at Rockford Manor. Her duties at Rockford Manor were very similar to her duties at Roosevelt Square and her later nursing jobs. (Tr. 38).

Plaintiff was diagnosed with lipodystrophy[2] after she had her first child. (Tr. 39). However, according to Plaintiff, lipodystrophy starts when you are very young and pregnancy usually brings out the symptoms more. (*Id.*). In 1980, Plaintiff stated that doctors tried to surgically correct her lipodystrophy, which helped a little bit initially, but in the end Plaintiff stated she still suffers pain associated with the lipodystrophy. (*Id.*).

In 1988, and recently, Plaintiff had some cardiac problems. (*Id.*). Plaintiff stated that in September and December 1997 or 1998, she had angioplasty for her cardiac problems. (Tr. 40). Like the procedure for the lipodystrophy, Plaintiff testified that although she felt better after the angioplasty, the feeling only lasted about a year and now she gets tired very quickly. (*Id.*). For example, Plaintiff stated she cannot lift heavy objects or walk up hills with even a slight grade because she tires very quickly. (Tr. 42).

In addition to the lipodystrophy and cardiac problems, Plaintiff suffers from diabetes. (*Id.*).

---

[2] Lipodystrophy is the "defective metabolism of fat." STEDMAN'S MEDICAL DICTIONARY 1020 (27th ed. 2000) Generally, lipodystrophy is characterized as either congenital, which is the complete lack of subcutaneous fat, or familial, which is the symmetric lipodystrophy of the trunk and limbs but the face is spared. *Id.*

4

To combat her diabetes, Plaintiff testified she must take pills daily and watch what she eats because she has problems with her cholesterol level. (*Id.*). Additionally, because of the diabetes, Plaintiff stated that her vision has been affected a little bit. (Tr. 43). The biggest problem associated with Plaintiff's diabetes is with her knees. Plaintiff stated that her legs swell and cause her tremendous pain and it becomes very difficult to move. (Tr. 45). The swelling and pain in Plaintiff's legs gets progressively worse in the day because the longer she is on her feet the more fluid that goes to her legs causing swelling. (*Id.*). Plaintiff stated her doctors recommend she walk on the treadmill to help her with the pain and swelling, which Plaintiff testified she does for thirty minutes three or four times a week. (Tr. 48).

In terms of Plaintiff's day-to-day activities, Plaintiff indicated that she normally gets out of bed between 6:00 a.m. and 7:00 a.m. (Tr. 49). When she gets out of bed, Plaintiff stated she normally reads for a while and then eats breakfast. (*Id.*). Usually, around 10:00 a.m., Plaintiff testified she walks, if it is her day to walk, and then after her walk, Plaintiff indicated she takes a shower and then works around the house. (*Id.*). Specifically, Plaintiff indicated that she does some housework, including vacuuming, but cannot do any housework that requires lifting. (*Id.*). During the night, Plaintiff testified that she is unable to sleep throughout the night because of the pain and she must elevate her feet on a bunch of pillows. (Tr. 50). In fact, when asked by the ALJ how much of the day Plaintiff must elevate her feet, Plaintiff testified that about half her day consists of having to elevate her feet. (Tr. 51).

Plaintiff also testified that she is able to drive her car, which includes driving to the grocery store two or three times a week. (Tr. 50). However, Plaintiff indicated that she is unable to drive long distances without stopping because her feet swell. (*Id.*). As an example, Plaintiff testified that

she had recently gone up to Wisconsin with her husband and her husband had to stop three times in a five hour span so that Plaintiff could combat the swelling in her feet. (*Id.*).

Vocational expert, Susan Entenburg, appeared before the ALJ at Plaintiff's July 1999 hearing. Ms. Entenburg testified that Plaintiff's job as a licensed practical nurse is considered to be skilled and medium in terms of exertional level. The part-time work Plaintiff did at Chrysler, Ms. Entenburg indicated, was light and unskilled. (Tr. 54). With that in mind, the ALJ directed Ms. Entenburg to assume an individual with the following limitations: "[t]aking someone ... who has one year of nursing school ... [and] can lift up to 20 pounds occasionally, ten pounds frequently, stand or sit an unlimited amount but can only walk incidentally and can't climb ladders or stairs, particularly with weights. And can't work where there are extremes of temperature." (Tr. 54-55). Ms. Entenburg, in response, indicated that such a person would be able to perform assembly line work (20,000 jobs in the Chicago metropolitan area) and other jobs that only required unskilled and light level performance. (Tr. 55). Specifically, Ms. Entenburg indicated that such a person could perform some packing jobs (10,000 jobs in the Chicago metropolitan area) and some machine operation jobs (10,000 jobs in the Chicago metropolitan area). (*Id.*). When asked to assume the person was further limited in that they could only still walk incidentally but "can only stand for two hours out of an eight hour day, but can still lift that amount," Ms. Entenburg indicated such a person could perform a full range of sedentary work and not light work due to the walking and standing limitation. (*Id.*). When asked to modify the first hypothetical and instead assume the individual requires the opportunity to sit or stand so that they can change position every hour, Ms. Entenburg indicated that assembly type jobs would be reduced to about 4,000 jobs, packing would be reduced to about 2,000 jobs, and machine operation jobs would be completely eliminated. (Tr. 56). Finally,

when asked to assume the individual had to elevate her legs "coffee table height" intermittently throughout the day, Ms. Entenburg states such an individual would not be able to perform any of the above mentioned jobs. (*Id.*). The key factor, therefore, is does Plaintiff have to elevate her legs.

## III. MEDICAL HISTORY

On August 26, 1988, Plaintiff, complaining of chest pain, saw Dr. H.C. Anderson of Swedish American. (Tr. 288). Dr. Anderson reported that on August 24, 1988, while walking briskly from work to her car (about a mile), Plaintiff felt a searing burning pain in the center of her chest and also pain in both wrists. (*Id.*). Dr. Anderson indicated that Plaintiff's past medical history included a long history of lipodystrophy and bilateral carpal tunnel syndrome. (*Id.*). Dr. Anderson reported that a review of Plaintiff's symptoms indicated that Plaintiff had no headache, blurred vision, no swollen glands, no history of thyroid trouble, no cough or expectoration, no hemotysis, no palpitations, no swollen ankles, no burning or frequency of urination, and no diarrhea. (Tr. 288-89). However, Plaintiff's blood pressure was high at 144/86. (Tr. 289). Dr. Anderson diagnosed Plaintiff as possibly having coronary insufficiency and lipodystrophy. (*Id.*).

Plaintiff also saw Dr. D. Wilson of Swedish American on August 26, 1988. (Tr. 284). Dr. Wilson reported Plaintiff's laboratory data revealed that her EKGs were nonspecific inferior T wave abnormalities without significant change. (*Id.*). Dr. Wilson also indicated that a stress test performed by Dr. Thomas, also of Swedish American, showed inferiro ST segment elevation at a law level of activity. (*Id.*). Plaintiff's angina pectoris were unstable. (*Id.*). An angiogram performed on Plaintiff confirmed a subtotal 99% stenosis of the medial circumflex artery with minor atherosclerosis and other vessels. (*Id.*). Dr. Wilson reported Plaintiff's final diagnosis included: coronary artery disease with unstable angina pectoris; history of hypertension; history of hypercholesterolemia; and

lipodystrophy. (*Id.*).

On August 28, 1988, Dr. Wilson performed a coronary and left ventricular angiogram and PTCA on Plaintiff. (Tr. 290). The results of the procedure indicated that the left ventricular angiogram showed a chamber of normal dimensions with ejection fraction of 60% and no significant wall segment abnormalities noted. (*Id.*). Plaintiff's left main coronary artery was free of significant atherosclerosis and Plaintiff's left anterior descending coronary artery showed no significant atherosclerosis. (*Id.*). The procedure further indicated that Plaintiff's left circumflex artery gave off a lateral circumflex branch and had a tight 95% obstructing lesion in the medial circumflex. Tr. 291). Plaintiff's right coronary artery showed no significant atherosclerosis and the post-PTCA files of the circumflex showed no significant residual stenosis at the site of PTCA. (*Id.*). Overall, Dr. Wilson indicated his impression of Plaintiff was that she had coronary artery disease with 95% obstructive lesion of the medial circumflex artery and elevated left ventricular and diastolic pressure but otherwise normal left ventricular angiogram and left ventricular function. (*Id.*).

Plaintiff saw Dr. Steven Diamond on March 3, 1995 regarding some vaginal bleeding. (Tr. 309). Dr. Diamond reported that at the time of the March 3, 1995 visit, Plaintiff was taking Calan,[3]

---

[3] Calan is a calcium ion influx inhibitor that is used on patients with angina, arrhythmias, and essential hypertension. *See* http://www.pharmacia.com/products/pdf/Calan.pdf (last visited June 12, 2003).

Ecotrin daily,[4] Mevacor,[5] occasional Trinalin,[6] Synthroid,[7] and Centrum multivitamins and aspirin daily. (*Id.*). Dr. Diamond assessed Plaintiff as suffering from acquired partial lipodystrophy, atherosclerotic heart disease status post angioplasty in 1988, elevated cholesterol and triglycerides, and hypothyroidism. (Tr. 310).

Plaintiff saw Dr. Diamond again on August 7, 1995. (Tr. 313). Plaintiff indicated at the time that she was suffering from a month plus history of left hip pain and occasional numbness in the left lateral thigh. (*Id.*). The laboratory results indicated an elevated glucose level with a reduction in cholesterol level. (*Id.*). Plaintiff's medication was the same as indicated on March 3, 1995. (*Id.*). However, Dr. Diamond also prescribe Diabeta[8] two and half times a day. Thus, Dr. Diamond

---

[4] Ecotrin is an aspirin tablet used to (1) reduce the combined risk of death and nonfatal stroke in patients who have had ischemic stroke or transient ischemia of the brain due to fibrin platelet emboli; (2) reduce the risk of vascular mortality in patients with a suspected acute MI; (3) reduce the combined risk of death and nonfatal MI in patients with a previous MI or unstable angina pectoris; and (4) reduce the combined risk of MI and sudden death in patients with chronic stable angina pectoris. PHYSICIANS DESK REFERENCE 1714 (57th ed. 2003).

[5] Mevacor is a cholesterol lowering agent that is used to reduce the total-C and LDL-C in heterozygous familial and nonfamilial form of primary hypercholesterolemia and in mixed hyperlipidemia. PHYSICIANS DESK REFERENCE at 2037.

[6] Trinalin is a long-acting antihistamine/decongestant that relieves nasal stuffiness and middle ear congestion cause by hay fever and ongoing nasal inflammation. *See* http://health.yahoo.com/health/drugs/tri1460/0.html (last visited June 12, 2003).

[7] Synthroid is a thyroid hormone that is used on patients with congenital or acquired hypothyroidism or supplemental therapy in congenital or acquired hypothyroidism or for the treatment or prevention of various types of euthyroid goiters. PHYSICIANS DESK REFERENCE at 3512.

[8] Diabeta is an oral blood-glucose lowering drug used in patients with non-insulin dependent diabetes mellitus whose hyperglycemia can be controlled by diet alone. PHYSICIANS DESK REFERENCE at 734.

diagnosed Plaintiff as suffering from lipodystrophy, diabetes, left trochanteric bursitis, and hypothyroidism. (*Id.*).

Plaintiff saw Dr. Diamond again on October 10, 1995. (Tr. 315). Dr. Diamond indicated that Plaintiff had recently discontinued the DiaBeta medication and instead was taking Glucophage[9]. (*Id.*). Dr. Diamond also reported that as of October 10, 1995, Plaintiff was having a hard time controlling her diabetes and checking her blood levels at home. (*Id.*). Dr. Diamond saw Plaintiff again on December 12, 1995. (Tr. 317). On this date, Plaintiff indicated to Dr. Diamond that she was having a problem related to leg edema when she stands up. (*Id.*). Plaintiff was unable to work because of this pain. Additionally, Plaintiff indicated that she could not sit for prolonged periods of time as this caused increased pain in her leg. (*Id.*). As of December 12, 1995, Dr. Diamond reported Plaintiff was suffering from lipodystrophy, diabetes, hypertriglyceridemia, hyperlipidemia, and hypothyroidism. (Tr. 318).

On December 15, 1995, Dr. Diamond, per the request of Plaintiff's counsel Gregory Tuite, wrote a summary letter regarding Plaintiff's medical condition. (Tr. 209). Dr. Diamond indicated in the letter that Plaintiff had developed "a complex medical condition where she is limited by discomfort in her legs from either prolonged standing or prolonged sitting." (*Id.*). Plaintiff's medical history includes partial lipodystrophy, hypothyroidism, atherosclerotic heart disease, severe elevation of her cholesterol and triglycerides, diabetes Type II, and a history of hypertension. (*Id.*). Finally, Dr. Diamond wrote that Plaintiff has increased difficulty in her day to day activities and spends a significant portion of her day with her legs elevated so that the swelling is not painful in

---

[9] Glucophage is an oral antihyperglycemic drug used in the management of type 2 diabetes. PHYSICIANS DESK REFERENCE at 1079.

10

her lower extremities. (*Id.*). In Dr. Diamond's opinion, Plaintiff's aliments cause her a significant limitation and the inability to do activities involving prolonged sitting or standing, not to mention that Plaintiff must have significant daytime elevation to prevent skin breakdown and painful leg edema. (*Id.*).

Plaintiff continued to see Dr. Diamond on almost a monthly basis. On March 5, 1996, Dr. Diamond indicated that he increased Plaintiff's Glucophage dosage from 2000mg to 2500mg. (Tr. 319). On May 6, 1996, Dr. Diamond reported Plaintiff was suffering from hypertension, elevated cholesterol, diabetes, lipodystrophy, allergic rhinitis, and hypothyroidism. (Tr. 320). Also, on May 6, 1996, Dr. Diamond indicated that Plaintiff stopped taking Mevacor because it elevated her liver function tests. Dr. Diamond started Plaintiff on Niacin. (*Id.*). Plaintiff continued to see Dr. Diamond, but the next medical report of substance is dated March 10, 1997. (Tr. 323). On that date, Dr. Diamond reported that Plaintiff discontinued the use of Niacin and DiaBeta. (*Id.*). Dr. Diamond reported that Plaintiff was concerned with her left hip occasionally "going out, as though she feels a twinge of tight left hip pain, ... ." (*Id.*). Dr. Diamond reported that Plaintiff had multiple health concerns including severely elevated triglycerides, lipodystrophy, chronic lower extremity pain related to the fatty deposition in her lower extremities, and left hip pain, which Dr. Diamond reported as probably mild arthritis. (*Id.*). Although at times hard to keep track, it appears that as of May 15, 1997, in terms of medication, Plaintiff was taking Kaolin, Ecotrin daily, Synthroid, Glucophage, Lipitor,[10] and DiaBeta daily. (Tr. 326).

On September 16, 1997, Dr. Eugene A. Silva, of Swedish American Hospital, performed a

---

[10] Lipitor is a cholesterol lowering agent that reduces total-C, LDL-C, and apo B in patients with homozygous and heterozygous FH, nonfamilial forms of hypercholesterolemia, and mix dyslipidemia. PHYSICIANS DESK REFERENCE at 2548.

coronary angiogram and angioplasty of Plaintiff's mid left anterior descending artery. (Tr. 345). Dr. Silva reported a left ventriculogram was performed on Plaintiff in the 30 degree RAD projection and an ejection fraction of 65% was calculated. (*Id.*). As for Plaintiff's coronary angiography, Plaintiff's left anterior descending showed some calcification in its proximal to mid third, and at the mid to distal third, a discrete 90% lesion in the LAD was noted. (*Id.*). Dr. Silva ultimately reported that the 90% lesion in the LAD was reduced to 10% and no intimal disruption was seen and good flows were noted. (*Id.*). Also, Dr. Silva noted that Plaintiff still suffered from a mild disease in the proximal circumflex and proximal right coronary artery in the site of Plaintiff's previous angioplasty, but that Plaintiff recovered left ventricular function with evidence of scalloping of the mitral valve. (*Id.*).

Dr. Silva saw Plaintiff again on November 20, 1997. (Tr. 335). Dr. Silva indicated that Plaintiff had a recurrence of chest discomfort with exertion recently and underwent a stress thallium which show evidence of anteroapical ischemia. (*Id.*). Plaintiff then underwent coronary angiography and was found to have a high-grade lesion of the LAD. (*Id.*). As of November 20, 1997, Plaintiff was participating in the cardiac rehabilitation program and doing well. (*Id.*). Overall, Dr. Silva's impression of Plaintiff were that she had stable coronary artery disease and a history of mitral valve prolapse and mitral valve regurgitation. (*Id.*).

Plaintiff saw Dr. Diamond again on October 29, 1997. (Tr. 425). Dr. Diamond reported that Plaintiff was not having any symptoms of chest pains, shortness of breath, or tiredness since her angioplasty. (*Id.*). Dr. Diamond indicated that Plaintiff's current list of medications included Calan,

Synthroid, Aspirin, Nitro-Dur,[11] Lipitor, Potassium, DiaBeta, Glucophage, Chromium, and daily multi-vitamins. (*Id.*). An early systolic Grade II/VI murmur in Plaintiff's left lower sternal border was noticed during Plaintiff's checkup. (*Id.*). Overall, Dr. Diamond indicated Plaintiff has known atherosclerotic heart disease, diabetes, severely elevated cholesterol, and acquired lipodystrophy. (*Id.*). Dr. Diamond did indicate, however, that Plaintiff had improved lipid levels and improved control over her diabetes. (*Id.*). Two months later, on December 29, 1997, Plaintiff saw Dr. Diamond who, after running tests, reported "recent labs are wonderful." (Tr. 426).

Dr. Robin F. Borchardt, of Swedish American Hospital, saw Plaintiff on December 12, 1997. (Tr. 353). Dr. Borchardt reported that up until December 5, 1997, Plaintiff had done quite well in terms of pain, but around December 5, 1997, Plaintiff again starting having chest pain and chest discomfort. (*Id.*). Dr. Borchardt noted that when Plaintiff sat down the pain went away but with any type of exertion, the pain returned. (*Id.*). As a result of her returning pain, Plaintiff saw Dr. Diamond on December 12, 1997. (Tr. 355). Dr. Diamond's examination of Plaintiff revealed that her initial physical examination was remarkable for being stable, her cardiac was normal and her abdomen was benign. (*Id.*). Dr. Diamond prescribed Plaintiff Lipitor, Calan, a nitroglycerin patch, Synthroid, Ecotrin, Glucophage, Ticlid,[12] Vitamin E, Vitamin C, Folate, and fish oil tablets. (*Id.*).

On December 15, 1997, Dr. Silva performed a left heart catheterization with coronary angiography and angioplasty and stenting of the LAD. (Tr. 422). Dr. Silva reported Plaintiff's left

---

[11]Nitro-Dur us used to relax the vascular smooth muscles and dilate the peripheral arteries and veins. Dilation of the veins promotes peripheral pooling of blood and decreases venous return to the heart, thereby reduces blood pressure. PHYSICIANS DESK REFERENCE at 3055.

[12] Ticlid is used to reduce the risk of thrombotic stroke in patients who have experienced stroke precursors and in patients who have had a completed thrombotic stroke. PHYSICIANS DESK REFERENCE at 2940.

main coronary artery was normal while the right coronary artery showed a long segment of diffuse disease throughout its proximal to mid third. (*Id.*). The vessel was 50-60% narrowed throughout its course with one area of 50-70% narrowing. (*Id.*). Dr. Silva also reported that the 90% lesion in the LAD was reduced to 0 residual and good flows were noted and maintained. (*Id.*).

Plaintiff saw Dr. Enas A. Enas of Rockford Cardiology Associates on January 6, 1998. (Tr. 400). Dr. Enas's diagnosis of Plaintiff indicated a family and personal history of premature CAD, diabetes mellitus, hypertensive cardiovascular disease, documented CAD with PTCS in 1988 and 1997, dyslipidemia with elevated cholesterol and triglycerides, and lipodystrophy of the lower extremities. (*Id.*). Dr. Enas recommended that Plaintiff decrease her dosage of Lipitor from 40mg to 20mg daily, begin Niaspan 750mg daily,[13] continue Vitamin E daily, reduce fish oil from 12gm to 6gm daily, and continue aspirin daily. (*Id.*).

Plaintiff saw Dr. Silva again on February 18, 1998. (Tr. 402). Dr. Silva, writing to Dr. Diamond, indicated that a physical examination of Plaintiff revealed a blood pressure of 142/80 with a heart rate of 78 and regular. (*Id.*). Plaintiff's cardiac exam revealed a regular rhythm without murmurs and her neck revealed no carotid bruits. (*Id.*). Dr. Silva's impressions of Plaintiff were that she had stable coronary artery disease, well controlled hypertension, well controlled noninsulin diabetes, and well controlled mixed hyperlipidemia. (*Id.*).

On March 2, 1998, May 5, 1998, and July 7, 1998, Dr. Enas's reevaluated Plaintiff in the Lipid Clinic. (Tr. 404, 405, 407 respectively). Dr. Enas's March 2, 1998 report indicated that Plaintiff's LDL was 80mg/dl and was within therapeutic range. (*Id.*). Plaintiff's triglycerides were

---

[13] Niaspan is a lipid-altering agent that is used for individuals at significantly increased risk of atherosclerotic vascular disease due to hypercholesterolemia. PHYSICIANS DESK REFERENCE at 1819.

158 mg/dl, which Dr. Enas wrote was considerably improved from the 450mg/dl in November, 1997, and Plaintiff's HDL remained low at 37mg/dl. (*Id.*). Because of Plaintiff's low HDL, Dr. Enas increased Plaintiff's Niaspan dosage from 750mg to 1500mg daily and increased her DiaBeta to 5mg. (*Id.*). On May 5, 1998, Dr. Enas reported that Plaintiff's HDL remained low – at 41mg/dl– and her cholesterol/HDL ratio decreased from 6.1 in November, 1997 to 3.1 as of May, 1998. (*Id.*). Dr. Enas did not make any changes to Plaintiff's medication or its dosage. On July 7, 1998, Dr. Enas reported Plaintiff's total cholesterol was 144mg/dl, triglycerides were 109 mg/dl, LDL was 82 mg/dl, HDL was 40 mg/dl, and Plaintiff's Cholesterol/HDL ratio was 3.6. (Tr. 407). Dr. Enas discontinued the Lipitor and instead prescribed Tricor, 200 mg.

Robert Lang, a technologist, performed a Thalium Scan on Plaintiff on June 8, 1998. (Tr. 386). After walking for nine minutes on a treadmill, Mr. Lang indicated that a review of the planar images revealed no significant motion artifact and no undue increase in lung intake. (*Id.*). Also, the test revealed minimal apical thinning and rest images appeared the same. (*Id.*). Mr. Lang concluded that the Thallium Scan was negative and Plaintiff's right coronary artery distribution did not appear to be ischemic. (*Id.*).

On July 7, 1998, Dr. Diamond wrote a letter to the Illinois Department of Human Services regarding Plaintiff's medical problems. (Tr. 368). Dr. Diamond wrote that since Plaintiff's early twenties, Plaintiff has been suffering from congenital acquired partial lipodystrophy, which is associated with facial fat wasting and massive adipose deposition in her legs with massive edema in her legs. (*Id.*). This, according to Dr. Diamond, is the cause of her main disability as the lipodystrophy is related to her aches and pains and edema in her legs. (*Id.*). Additionally, as a consequence of Plaintiff's chronically elevated cholesterol and triglycerides, Plaintiff had developed

atherosclerotic heart disease and has had to have angioplasty in 1988, 1997, and stenting in December 1997. (*Id.*). As a result of Plaintiff's medical problems, Dr. Diamond indicated Plaintiff takes numerous medications including Glucophage, Tricor, Niaspan, Coenzyme Q, Clan, fish oil, Synthroid, Potassium, Nitro-Dur, DiaBeta, and Ecotrin. (*Id.*). Finally, Dr. Diamond indicated Plaintiff's activity is limited in that she is bothered by aches and pains in her legs if she stands for long periods of time and her activity is limited to the point that if she does any housework on one day, Plaintiff will be in pain and tired for several days. (*Id.*).

On March 24, 1998 and July 13, 1998, Plaintiff's physical RFC assessment was performed by two non-treating and non-examine physicians. (Tr. 378-85, 388-95). Dr. Deborah Albright performed the March 24, 1998 assessment. Dr. Albright indicated that Plaintiff can occasionally lift fifty pounds and frequently lift twenty-five pounds. (Tr. 379). Additionally, Dr. Albright indicated Plaintiff can stand and/or walk about six hours in an eight hour day and sit for about six hours in an eight hour day. (*Id.*). Plaintiff's ability to push and/or pull, according to Dr. Albright, was unlimited. (*Id.*). Dr. Albright also indicated Plaintiff had no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations (Tr. 390- 92).

On July 13, 1998, Dr. Victoria Dow, in assessing Plaintiff's RFC, indicated that Plaintiff can occasionally lift fifty pounds and frequently lift twenty-five pounds. (Tr. 389). Additionally, Dr. Dow indicated Plaintiff can stand and/or walk about six hours in an eight hour day and sit for about six hours in an eight hour day. (*Id.*). Plaintiff's ability to push and/or pull, according to Dr. Dow, was unlimited. (*Id.*). Dr. Dow also indicated Plaintiff had no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations.

(Tr. 390-92). Also of note, Dr. Dow noted that Plaintiff's cardiac testing of June 1998 was negative for ischemic and that there was no evidence of diabetic complications. (Tr. 395). Additionally, while Plaintiff had edema of her lower extremities due to lipodystrophy, Dr. Dow reported that Plaintiff was ambulatory without assistance. (*Id.*).

Plaintiff returned on October 27, 1998 to see Dr. Diamond regarding neck pain and shortness of breath. (Tr. 430). Dr. Diamond reported that Plaintiff had been doing "heavy pre-surgery type work in her backyard. She has been removing trees with her husband after a major storm knocked down a dozen trees." (Id.). After evaluating Plaintiff, Dr. Diamond reported Plaintiff's lungs were clear, her cardiac exam was normal, and that Plaintiff seemed to be doing very well. (Id.).

Dr. Silva wrote Dr. Diamond on November 12, 1998 regarding Plaintiff's medical condition at the time. (Tr. 409). Dr. Silva indicated that Plaintiff has not been experiencing any neck or chest pain since October and that she has been walking 1.75 miles a day on the treadmill in roughly one half hour. (*Id.*). Plaintiff's medication, ever growing, included Calan, Glucophage, DiaBeta, Synthroid, Ecotrin, Niaspan, KCl, folic acid, Vitamin E, Vitamin C, Coenzyme, Chromium, magnesium, fish oil, and Tricor. (*Id.*). Dr. Silva reported his impressions of Plaintiff were that she had stable coronary artery disease postangioplasty and stenting of the LAD, stable diffuse right coronary artery disease, well controlled hypertension, and well controlled mixed hyperlipidemia. (*Id.*).

Dr. Enas wrote Dr. Diamond on January 18, 1999 regarding Plaintiff. (Tr. 410). Dr. Enas reported Plaintiff cholesterol was 216 mg/dl, her triglycerides were 101 mg/dl, LDL 138 mg/dl, HDL 58 mg/dl, and Cholesterol/HDL ratio was 3.7. (*Id.*). Dr. Enas indicated that because Plaintiff's LDL level increased, he put her on Zocor. (*Id.*). Overall, Dr. Enas reported that, as of January 18, 1999,

17

Plaintiff had no new cardiac symptoms or hospitalizations for cardiac events and a cardiac evaluation of Plaintiff indicated that she had no gallops, murmurs, arrhythmia, rubs or signs of heart failure. (*Id.*). Dr. Enas again wrote Dr. Diamond on June 9, 1999, the substance of which was the same as the letter dated January 18, 1999. (Tr. 412).

On June 11, 1999, Dr. Silva wrote Dr. Diamond and indicated that Plaintiff "has been feeling great, denying any symptoms of chest discomfort." (Tr. 414). Dr. Silva's physical examination revealed that Plaintiff's blood pressure was 120/72 with a heart rate of 66. (*Id.*). Plaintiff's lungs were clear and she had a regular cardiac rhythm with an S4 gallop. (*Id.*). Plaintiff's medication lists remained, for the most part, the same. (*Id.*).

After June 11, 1999, the next entry of any substance is not until March 14, 2000. (Tr. 441). Allegedly, after Plaintiff's hearing before the ALJ, Plaintiff came under the care of a new primary physician – Dr. Margaret A. Myslek. (*Id.*). Dr. Myslek, in a handwritten note, wrote "To whom it may concern ... patient qualifies for sedentary work." (*Id.*). This note allegedly was provided to the Appeals Council.

## IV.    STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable

minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.    FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[14] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be

---

[14]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

done, for pay or profit.  20 C.F.R. § 404.1510.  If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[15]  A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  The claimant's age, education, and work experience are not considered in making a Step Two severity determination.  20 C.F.R. § 404.1520(c).  If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1.  The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a).  The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986).  Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work.  Residual functional capacity is a

---

[15]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments.  See, e.g., 20 C.F.R. § 404.1520(c).  For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala*, 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.    ANALYSIS

The court will proceed through the five step analysis in order.

22

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on . (Tr. 19 ).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found that Plaintiff suffered from non-insulin dependent diabetes mellitus, osteoarthritis of the knees, and cardiac problems (for some reason the ALJ ignored the lipodystrophy). (Tr. 19-20).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C.  Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 19).

23

Specifically, in regards to Plaintiff's non-insulin dependent diabetes, the ALJ found that this impairment "has not produced significant neuropathy in the upper or lower extremities, amputation, acidosis, or retinopathy." (*Id.*). Therefore, the ALJ found Plaintiff non-insulin dependent diabetes impairment does not satisfy section 9.08. (*Id.*).

Additionally, the ALJ found Plaintiff's osteoarthritis of the right knee did not meet or equal the requirements of section 1.03. (*Id.*). Specifically, the ALJ found that in 1994, an x-ray of Plaintiff's right knee showed mild degenerative changes and some narrowing. A treatment note in August 7, 1995 indicated normal gait and later treatment notes "do not even discuss arthritis of the knees." A March 10, 1997 treatment note indicated that an x-ray showed mild degenerative joint disease of the left hip and that Plaintiff felt a twinge that lasted variable amounts of time. However, the ALJ noted that many of the medical records generally fail to discuss complaints related to the knees or the hips. (*Id.*).

Finally, as to Plaintiff's cardiac problems, the ALJ indicated Plaintiff's condition do not meet or equal section 4.04. (*Id.*). Specifically, the ALJ proceeded through Plaintiff's cardiac medical history documenting Plaintiff's apparent improvement with each process. (Tr. 20). The ALJ ended his analysis with Plaintiff's January and June 1999 treatment notes which indicated that Plaintiff showed no cardiac symptoms or hospitalizations and, in fact, Plaintiff reported she was "feeling great." (*Id.*).

Substantial evidence exists to support the ALJ's very thorough and reasonable findings and the court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D.      Step Four: Is the claimant capable of performing work which the claimant performed in

the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff is unable to perform any of her past relevant work. (Tr. 22). In coming to this conclusion, the ALJ first had to determine Plaintiff's RFC. In determining the Plaintiff's RFC, the ALJ addressed Plaintiff's medical evidence, alleged symptoms, impairments and limitations. (Tr. 20). Specifically, in terms of Plaintiff's alleged symptoms, impairment and limitations, the ALJ found that Plaintiff has pain in her legs that affects her ability to stand or walk and causes her knees and hips to "go out" so that she can only stand for short periods of time. (*Id.*). Additionally, because of the lipodystrophy, Plaintiff's legs swell and cause her pain so that she must elevate her legs. Plaintiff cannot do any heavy lifting or walk up hills but she is able to, as determined by the ALJ, drive for short distances, vacuum, wash dishes, and do other household tasks. (*Id.*).

In terms of the medical evidence, the ALJ found the objective medical findings fail to provide strong support for the Plaintiff's allegations of disabling symptoms and limitations. (Tr. 21). Specifically, the ALJ found that while Plaintiff did suffer from a massive edema of both lower extremities, more current treatment notes do not reflect findings of ongoing edema. (*Id.*). Rather, Plaintiff is able to perform stress tests, exercise 10 METS (which according to the ALJ is indication of "good exercise tolerance"), walk 30 minutes a day on her treadmill without adverse effects, do "a lot of yard work," and participate in a "fairly brisk yoga workout[.]" (*Id.*).

Overall, after evaluating Plaintiff's subjective complaints using factors in SSR 96-7p and 20 C.F.R. §404.1529(c), the ALJ found Plaintiff's impairments preclude the following: "lifting more than 20 pounds occasionally or 10 pounds frequently or working in a job that does not allow

[Plaintiff] to change position every hour."[16] (Tr. 20).

Ultimately, the ALJ found that Plaintiff could not perform her past relevant work because "even [Plaintiff's] least demanding past work required lifting more than 20 pounds occasionally, ... ." (Tr. 22). The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step Four of the Analysis is affirmed.

E.    Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

At Step Five The ALJ determined that although Plaintiff's RFC did not allow her to perform the past relevant work, there existed a significant number of jobs in the national economy that she can perform. (Tr. 22). Specifically, the ALJ found that Plaintiff, fifty two years old with a high school education and nursing school degree, has a skilled past work history with no transferable skills within her RFC. (*Id.*). According to the ALJ, if the Plaintiff could perform the full range of light work, then rule 202.14 of the Medical-Vocational Guidelines, Appendix 2, Subpart P, Part 404 of the regulations, would apply and a direct finding of not disabled would be demanded. (*Id.*). However, the ALJ found that because of Plaintiff's other limitations, specifically her need to change positions every hour, Rule 202.14 could not be directly applied to Plaintiff. Nonetheless, the ALJ,

---

[16] Although not labeled as such by the ALJ, the ALJ's RFC is essentially a light work limitation. §404.1567(b) *Light Work*. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

26

after consulting with a vocational expert, found that a person with Plaintiff's RFC limitations could perform the following jobs: assembly (4,000 jobs in the six county Chicago metropolitan area), packing (2,000 jobs in the six county Chicago metropolitan area), and machine operation (2,000 jobs in the six county Chicago metropolitan area). Therefore, because the jobs cited represented a significant number of jobs in the national economy, the ALJ found that Plaintiff is not disabled as per title II of the Social Security Act.

Plaintiff makes numerous arguments in contention of the ALJ's ultimate finding. While this Court has read and considered all of them, this Court will focus on Plaintiff's strongest argument against the ALJ's finding; that being, that the vocational expert's testimony and the ALJ's RFC determination at Step Five do not coincide. (Br. in Support of Pl.'s Mot. for Summ. J. at 4). The vocational expert, Ms. Entenburg, stated that an individual " ... who has one year of nursing school ... [and] can lift up to 20 pounds occasionally, ten pounds frequently, stand or sit an unlimited amount but can only walk incidentally and can't climb ladders or stairs, particularly with weights," would be able to perform assembly line work (20,000 jobs in the Chicago metropolitan area) and other jobs that only required unskilled and light level performance. (Tr. 55). However, when asked to assume the person was further limited in that they could only still walk incidentally but "can only stand for two hours out of an eight hour day, but can still lift that amount," Ms. Entenburg indicated such a person could perform a full range of sedentary work and not light work due to the walking and standing limitation. (Id.). When asked by the ALJ to modify the first hypothetical and instead assume the individual requires the opportunity to sit or stand so that they can change position every hour, Ms. Entenburg indicated that assembly type jobs would be reduced to about 4,000 jobs, packing would be reduced to about 2,000 jobs, and machine operation jobs would be completely

eliminated. (Tr. 56). Finally, when asked to assume the individual had to elevate her legs "coffee table height" intermittently throughout the day, Ms. Entenburg states such an individual would not be able to perform any of the above mentioned jobs. (*Id.*). The ALJ's RFC determination, however, did not include a limitation that Plaintiff had to elevate her legs. Instead, the ALJ's RFC limitation contained only that Plaintiff cannot do any heavy lifting or walking up hills, but she is able to drive for short distances, vacuum, wash dishes, and do other household tasks.

Specifically, Plaintiff argues that while the ALJ's first hypothetical to the vocational expert was based upon an assumption of the ability to perform light work, the second hypothetical limited standing to two hours out of an eight hour day. This limitation, according to the vocational expert, would place Plaintiff into a sedentary category. This placement, in turn, as argued by Plaintiff, would entitle Plaintiff to an automatic finding of disabled under Grid Rule 201.14. Lastly, the ALJ, in reverting back to the first hypothetical that did not include the standing limitation, included the limitation that Plaintiff would have to elevate her legs during the day. This limitation would eliminate any jobs identified previously by the vocational expert. Thus, Plaintiff argues, because the ALJ did not make a finding on the question of elevation of Plaintiff's legs or a finding regarding the total ability to stand in an eight hour day, this Court should remand for an express finding on the question of need to elevate the legs and on the total amount of standing that would be done in an eight hour day. (*Id.* at 5). This Court agrees.

The ALJ's conclusion at Step Five was based strongly on the ALJ's belief that Plaintiff's subjective limitations do not coincide with Plaintiff's objective medical evidence. (Tr. 21). Specifically, the ALJ stated that "[w]hile the treating physician endorses the [Plaintiff's] view, the record shows that findings of edema upon examination have been rare." (*Id.*). This, however, is

inconsistent with Dr. Diamond's assessment. (Tr. 369)(" ... the patient is bothered chronically by aches and pains in her legs if she stands up for a long period of time. She also has significant edema.") Additionally, the ALJ focused on what the ALJ found to be Plaintiff's daily activities that were "far in excess of [Plaintiff's] stated ability to stand or walk on a regular basis[,]" such as Plaintiff's ability to do a brisk yoga workout, engage in gardening, remove fallen trees, and walk on her treadmill. (Tr. 21-22). While this Court does not disagree that Plaintiff may be able to do the above mentioned activities, this Court has some reservations about Plaintiff's ability to work an eight hour day without being able to elevate her feet. Dr. Diamond has indicated that Plaintiff must elevate her feet throughout the day, no other doctor or medical record indicates anything to contradict Dr. Diamond.

While a treating physician is not the ultimate determiner on whether an individual is disabled or not disabled, this Court will give some weight to a treating physicians opinion. Specifically, on at least two occasions, Dr. Diamond reported that Plaintiff's medical conditions prevented her from working. On the first occasions, Dr. Diamond, writing to Michelle Curtis of the Illinois Department of Human Services, wrote "[Plaintiff's] activity is limited to the point that if she does her homemaking activities on one day, she will be achy and tired for several days. The [Plaintiff] has previously worked as a nurse and has been disabled for several years related to the above problems. ... I would recommend the patient as having ongoing disability." (Tr. 368-69). On the second occasion, after seeing Plaintiff on July 7, 1998, Dr. Diamond wrote "At this point I believe [Plaintiff] is medically stable on the very complicated regime. I filled out her disability papers, which I believe she is continuing to be disabled given her multiple symptoms and problems." (Tr. 429).

Additionally, this court has some reservations about the lack of information ascertained by

the ALJ regarding Plaintiff's edema and the extent of her capabilities. Specifically, given that Plaintiff has pain in her legs from swelling and has to elevate her feet periodically through the day, what exactly can Plaintiff do? Plaintiff testified that she elevates her legs for half of her day. Dr. Diamond agreed that elevation was necessary. There is no evidence in the record which would indicate Plaintiff does not have to elevate her legs.

Further, Defendant argues that Dr. Diamond's views of Plaintiff's disability are not supported by the objective medical evidence and thus should be dismissed pursuant to 20 C.F.R. §404.1527(d)(4)(explaining that the more consistent an opinion is with the record as a whole, the more weight the ALJ will give that opinion). However, the Defendant fails to cite to §404.1527(d)(1) and (2)(i) and (ii). Section 404.1527(d), titled *How we weigh medical opinions*, states, in pertinent part, that "Regardless of the source, we will evaluate every medical opinion we receive." However, 404.1527(d)(1), titled *Examining relationship*, states, in pertinent part, that "we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." Section 404.1527(2), titled *Treatment relationship*, states, in pertinent part, that "we give more weight to opinions from your treating source, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairments ... ." In balancing the weight given to a treating physician, the code states, "the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion." §404.1527(d)(2)(i). Additionally, the "more knowledge a treating source has about your impairment(s) the more weight we will give to

the source's medical opinion." 20 C.F.R. §404.1527(d)(2)(ii).[17]

Given the fact that the ALJ acknowledged in her questioning to Plaintiff that Plaintiff had been seeing Dr. Diamond for "many years" and on a "fairly regular basis," it is hard to comprehend how the ALJ could dismiss Dr. Diamond's assessment of Plaintiff. (Tr. 43-44). Further, the Defendant argues that many treatment notes did not generally reflect a finding of ongoing edema. (Comm'r Mot. for Summ. J. at 10). Defendant's argument is correct in that Dr. Diamond did not specifically discuss "edema" on every medical record as Plaintiff was obviously suffering from many other medical conditions, but Defendant in incorrect in its blanket assertion that Dr. Diamond's finding did not reflect findings of ongoing edema, because throughout his notes, Dr. Diamond makes references to Plaintiff's pain in her extremities. (Tr. 323)(finding that "[Plaintiff] is concerned on further discussion about her left hip occasionally going out, ..." and that Plaintiff is suffering from "chronic lower extremity pain ... .")

---

[17] There appears to be some conflict in the Seventh Circuit on the weight a treating physician should receive in determining whether an individual is disabled or not. *Compare Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)(stating "the ALJ properly noted that more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances."); *Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000)(stating "A physician's opinion regarding the nature of severity of an impairment will be given controlling weight if it is well supported by the medically acceptable ... techniques."), *with Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 917 (7th Cir. 2003)(stating "physicians naturally tend to support their patients' disability claims, and so we have warned against 'the biases that a treating physician may bring to the disability evaluation.'")(citing *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)); *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985)(explaining that "the patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.")

Additionally, given the medically verified pain Plaintiff experiences in her lower extremities, it is hard to understand how the ALJ's RFC of Plaintiff could contain a limitation that Plaintiff can only work in jobs that allow her to change positions every hour. (Tr. 20). For one thing, after reviewing the transcript, such a limitation was not discussed with the vocational expert and how the ALJ arrived at such a limitation is unknown to this Court. Additionally, after reviewing Plaintiff's medical record, it appears the ALJ was closer to Plaintiff's correct RFC when she changed the hypothetical to include a limitation that Plaintiff can only walk incidentally but can only stand for two hours out of an eight hour day. (Tr. 55). Lastly, it is hard to understand how the ALJ's RFC determination did not include some mention that Plaintiff must elevate her feet at various points throughout the day.

Therefore, on remand this Court suggests the ALJ establish a RFC limitation for Plaintiff that coincides with the vocational expert's testimony. Specifically, the ALJ might determine the length of time Plaintiff must elevate her legs to alleviate the pain associated with her leg swelling, how many times in a given day the Plaintiff must elevate her feet, and the extent of Plaintiff's abilities given her lower extremity pain. Once determined, the ALJ could incorporate such findings into a new RFC for Plaintiff. Further, Dr. Diamond could provide the ALJ with any recent medical records and reevaluate Plaintiff and provide the ALJ with a thorough analysis of Plaintiff's edema and the extent to which Plaintiff's edema limits her ability to work.

## VII.  CONCLUSION

For the above mentioned reasons, it is the Report and Recommendation of the Magistrate Judge that Plaintiff's Motion for Summary Judgment be granted and the case remanded. On remand, the ALJ should establish a RFC limitation for Plaintiff that coincides with the vocational expert's

testimony. Specifically, the ALJ might determine the length of time Plaintiff must elevate her legs to alleviate the pain associated with her leg swelling, how many times in a given day the Plaintiff must elevate her feet, and the extent of Plaintiff's abilities given her lower extremity pain. These findings could be incorporated into a new RFC for Plaintiff. It is also the Report and Recommendation of the Magistrate Judge that Defendant's Motion for Summary Judgment be denied. The parties are given ten days from service of this Order, as calculated under Rule 6, to appeal to Judge Philip G. Reinhard, pursuant to Rule 72 of the Federal Rules of Civil Procedure.

**ENTER:**

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 6/19/03